IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

UNITED STATES OF AMERICA,

                Plaintiff,

v.                                          No. 2:19-cr-20023-JTF-1

TERRY JOHNSON,

                Defendant.

---

REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

---

On September 26, 2019, the grand jury returned a superseding indictment charging the defendant, Terry Johnson ("Johnson"), with one count of possession with the intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1), one count of possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c), one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), and one count possessing a firearm having been previously convicted of a misdemeanor crime of domestic violence in violation of 18 U.S.C. § 922(g)(9). (Superseding Indictment, ECF No. 14.) Before the court is Johnson's November 25, 2019 motion to suppress any and all evidence obtained as a result of a search near the MATA bus station located at 3921 American Way, Memphis, Tennessee. (Mot. to Suppress, ECF No. 24.) Johnson argues that his rights under

the Fourth Amendment were violated. (*Id.*) This motion has been referred to the United States Magistrate Judge for report and recommendation. (Order of Ref., ECF No. 26.)

Pursuant to the order of reference, an evidentiary hearing was held on February 26, 2020. (Minute Entry, ECF No. 36.) At the hearing, the government called Memphis Police Department ("MPD") Detective Star Handley ("Detective Handley") as its only witness. Johnson called MPD Sargent Shannon Bowen ("Sargent Bowen") as a witness and Johnson also testified. Additionally, Johnson introduced two exhibits: (1) the MPD's Record of Arrest (the "Record of Arrest") marked as Exhibit 1 and (2) the Affidavit of Complaint marked as Exhibit 2.

After careful consideration of the statements of counsel, the testimony of witnesses, the evidentiary exhibits, and the entire record in this case, the court submits the following findings of fact and conclusions of law and recommends that the motion to suppress be denied.

## I.   PROPOSED FINDINGS OF FACT

Johnson's arrest, and subsequent indictment, arise from a series of events which occurred on September 18, 2017 at or around 9:00 AM. On that day, Detective Knight, Detective Handley, and Sargent Bowen witnessed Johnson walk out of line and away from the MATA bus station to a nearby convenience store. After Detective Handley's and Detective Knight's encounter with Johnson, two bags

2

and a Taurus 9mm handgun were seized and Johnson was subsequently taken into custody.

A.    The Record of Arrest and the Affidavit of Complaint

The Record of Arrest dated September 18, 2017, states that around 9:00 AM Detective Knight, along with Detective Handley and Sargent Bowen, arrived at the MATA bus terminal.  (Record of Arrest, Ex. 1.)  The officers were there to conduct a safety check on the Megabus headed to Dallas, Texas.  (*Id.*)  The Record of Arrest indicates that while there, the officers observed Johnson, who was second in line to board the bus, get out of the line and walk towards the convenient store when Detectives Knight and Handley approached the bus.

According to the Record of Arrest, Detectives Knight and Handley approached Johnson and requested that he show them his ID. (*Id.*)  Additionally, the detectives asked him why he had gotten out of line.  (*Id.*)  The Record of Arrest also states that "Johnson advised that he had no ID and he was going to get on the bus until he saw officers."  (*Id.*)  According to the Record of Arrest, Detective Handley then asked Johnson whether he had anything illegal, to which Johnson replied that he had "about a half ounce of marijuana."  (*Id.*)  The Record of Arrest indicates that at that time, Detective Handley proceeded to open Johnson's red backpack which contained two large bags of marijuana and a Taurus 9mm

handgun.    (*Id.*)    Johnson was subsequently taken into custody.
(*Id.*)[1]

B.    <u>Detective Handley's Testimony</u>

The government called Detective Handley as its only witness.
Detective Handley testified that he has worked with uniform patrol,
Project Safe Neighborhood, and the Drug Enforcement Agency while
employed with the MPD, and at the time of Johnson's arrest, he was
working with Team 7 of the Organized Crime Unit ("OCU") of the
MPD.  Detective Handley has been in law enforcement since 2003 and
with the OCU since 2006.  Detective Handley testified that only
the Criminal Apprehension Team unit of OCU wore body cameras and
as such, none of the officers performing interdiction were wearing
body cameras on the day in question.

On September 18, 2017, Detective Handley, Detective Knight,
and Sargent Bowen arrived at the MATA bus station on American Way.
The officers were there to perform interdiction on the Megabuses.
Detective Handley explained that the OCU receives complaints from
transit locations, such as train and bus stations, regarding the
movement of contraband or individuals attempting to evade
warrants.  As part of interdiction, the officers make a safety
announcement asking individuals whether they would consent to

---

[1] The Affidavit of Complaint signed by Shelby County General
Sessions Judge Yolanda R. Kight, restates the same facts with no
additional information.  (Aff. of Compl., Ex. 2.)

4

having their bags searched and their identifications checked. Detective Handley testified that these encounters are meant to be consensual. Detective Handley explained that the interdiction team is frequently told by their Sargent – Sargent Bowen – to be "prepared to get [their] feelings hurt" as a reminder that these encounters are meant to be consensual and if a person does not volunteer, the officers must move on. Detective Handley stated that since 2018, he had participated in over 100 interdictions at Megabus locations. As a result, Detective Handley has extensive familiarity with the pattern of travel and the process of loading and boarding the busses. Furthermore, Detective Handley explained that when they perform interdiction, people generally recognize that the officers are MPD upon their arrival.

Detective Handley testified that on September 18, 2017 the officers exited their vehicles and put on their gun belts and vests. The vests say "police" on both the front and back and the officer's badge is usually affixed to the front of the officer's vest or gun belt. At that point, several people were already in line and the buses were loading. Detective Handley estimated that there were more than ten people already in line. Detective Handley and Detective Knight observed Johnson walk, not run, away from the line as they approached. Detective Handley testified that he and the other officers had been there only a few minutes, were dressed in police gear, and approximately thirty feet away from Johnson

when Johnson left the line.  Johnson walked towards a convenience store on Getwell, which Detective Handley estimated to be approximately 100 yards away.  According to Detective Handley, Johnson was the only individual who got out of line.

Detective Handley testified that this was suspicious behavior because, in his experience, individuals could be waiting over several hours for their bus and it is unlikely that once in line to board the bus, an individual will step out of line.  Detective Handley explained that there is generally only a ten-minute window once the bus starts loading before the bus leaves.  Detective Handley is familiar with that timeline because it is the same timeline officers must work with to perform interdiction. Additionally, Detective Handley stated that in his experience, usually only individuals with contraband or those attempting to evade a warrant will get out of line upon seeing police officers. When questioned about whether Johnson could have had another reason for leaving, such as to get food or water before the ride, Detective Handley admitted Johnson could have had another reason, but that it was unlikely in this case because once the bus was loading it was not likely Johnson could have made it to the convenience store and back to the bus before it left.

According to Detective Handley, he and Detective Knight followed Johnson to the convenience store and approached Johnson before he entered the convenience store.  Detective Handley

testified that he could not remember exactly what he said to get Johnson's attention, but that he most likely said something along the lines of "Hey, can I talk to you for a second?" Detective Handley stated that he would not have said "stop," or "police, stop," and he knew he did not physically touch Johnson. Furthermore, Detective Handley indicated that had Johnson continued into the store, he would have let him. According to Detective Handley, both he and Detective Knight were in police gear and it would have been apparent to Johnson that they were police officers.

Detective Handley asked Johnson for his name and asked whether he had any identification. Johnson replied that he did not have any identification. Detective Handley testified that upon approaching Johnson, he could smell raw marijuana. At the time, Detective Handley had worked with the OCU for eleven years and testified that he was familiar with the smell of both raw and burnt marijuana. Detective Handley was unsure whether Detective Knight also smelled the marijuana and Detective Handley did not tell Johnson he smelled marijuana. Detective Handley explained that in his experience, drugs and weapons are typically found together. Detective Handley explained that it was common for people traveling with drugs to also travel with a weapon and he therefore had concern for officer safety. Detective Handley then asked Johnson if he had anything illegal. According to Detective Handley,

7

Johnson replied that he had half an ounce of marijuana in his bag, and Detective Knight then detained him.

Detective Handley testified that he began searching Johnson's bag, and while searching, he then asked Johnson if he could look through his bag. According to Detective Handley, Johnson unequivocally stated yes. The two bags of marijuana and Taurus 9mm handgun were found in the bag and seized. Additionally, Detective Handley identified the Record of Arrest and the Affidavit of Complaint and stated that Detective Knight completed those forms.

C.    Sargent Bowen's Testimony

Johnson called Sargent Bowen as a witness. Sargent Bowen testified that he was currently employed in MPD's canine unit but worked on Team 7 of the OCU with Detective Handley in September 2017. On September 18, 2017, the team was working interdiction at the outgoing bus station. Sargent Bowen testified that he was at bus stations, such as this one, almost daily. When questioned about how the team performs interdiction, Sargent Bowen explained that generally there are at least three officers, and on that specific day, there were three: Sargent Bowen, Detective Handley, and Detective Knight. The officers arrived at the bus station as the buses were beginning to load. The three officers had on their police gear as they began observing individuals at the bus station, which Sargent Bowen stated was routine. Sargent Bowen also

reiterated that, generally, when the officers arrive, people stop and look.

Sargent Bowen explained that individuals riding the Megabuses (as opposed to those riding the city MATA buses) generally do not go inside the MATA station and must wait outside.  He was unsure of whether there were any vending machines or other food options available inside the station.  Sargent Bowen also reiterated the purpose of telling his team to be "prepared to get [their] feelings hurt."  Sargent Bowen explained that some people, whether hiding something or not, will say no and their encounters with individuals when performing interdiction are meant to be consensual encounters only.

According to Sargent Bowen, there were already people in line when the officers arrived.  Johnson was towards the front of the line waiting to board the bus.  He observed Johnson leave the line and begin to walk towards the convenience store.  Sargent Bowen was unaware of whether Johnson ever entered the store.  Sargent Bowen did not approach Johnson and did not see him again until he was brought back with Detectives Handley and Knight.  Additionally, Sargent Bowen testified that he did not complete the Affidavit of Complaint or the Record of Arrest, but that he believed Detective Knight did.

D.    Johnson's Testimony

Johnson also testified at the hearing after being explained his Fifth Amendment rights and choosing to waive those rights. Johnson boarded a bus at 2:00 AM in Saint Louis, Missouri, and arrived in Memphis at approximately 7:00 AM. He had a two-hour delay before the 9:00 AM bus arrived and had been standing in line for approximately one and half hour. Johnson was second in line. According to Johnson, a baggage handler at the bus station told the individuals in line that if they needed to use the restroom or purchase food, they could walk to the convenience store. Johnson testified that he never saw the police approach the bus station.

Johnson stated that he walked into the convenience store, made several purchases, and then was approached by an officer wearing plain clothes and no badge. The officer asked Johnson his name and where he was going, and Johnson replied that he was going to the bus. Johnson testified that he was scared and was unsure of what was going on. Johnson stated that he attempted to push past the officers, but one of them brought out a badge which was attached to a chain around the officer's neck. The officer then requested that Johnson sit down outside of the store, on the curb. The officer asked Johnson for his identification and Johnson placed his bag down, a small, red backpack, as he reached for his wallet. Johnson stated that an officer told him that he "fit the description of someone [the officers] are looking for," but did not say anything about Johnson smelling like marijuana. Johnson

10

then stated that one of the officer's later "tried to say he smelled weed." Johnson's testimony was unclear as to whether he did or did not admit to having marijuana in his bag.

Johnson testified that Detective Knight grabbed the bag. Inside the bag, the Taurus 9mm handgun was located on top of clothes and the weed was wrapped and placed inside the pocket of a pair of pants. According to Johnson, when the officer opened the bag and saw the gun, the officer stated, "F*** that weed, you're going to jail for the gun."

Johnson's timeline of the officers finding the contraband is slightly unclear from his testimony, but Johnson testified that the gun was found first because it was sitting on top of clothes inside the bag. According to Johnson, he was then taken to the police car and placed in the back while officers opened his backpack and found the weed by going through his clothes.

On cross-examination, Johnson testified that he knew the bus left at 9:00 AM, but then testified that the bus was not there yet. Johnson also gave various amounts of time that the baggage handler stated they had before the bus left. Johnson first stated they were told they had fifteen minutes, then testified that they had forty minutes, and again later testified that they were told they had thirty minutes. When questioned about the marijuana, Johnson testified that it was OG Kush. Furthermore, Johnson testified that the marijuana did smell, but that it was in Ziplock

bags.  Additionally, Johnson explained that he had smoked marijuana approximately seven hours before and that the clothes he was wearing when he smoked the marijuana, which he admitted possibly smelled like marijuana, were in his backpack.

## II.  PROPOSED CONCLUSIONS OF LAW

Johnson contends that he was seized and then his backpack searched in violation of the Fourth Amendment because officers did not have reasonable suspicion to stop him or search him pursuant to a *Terry* Stop, did not have probable cause to stop him or search his bag during the alleged seizure, and any consent Johnson may have given was coerced.  (Mot. to Suppress 2-11, ECF No. 24.)  In its response, the government argues that the initial interaction was a consensual encounter and thereafter offices had reasonable suspicion to engage in a *Terry* Stop and probable cause to conduct a search.  (Resp. 3-5, ECF No. 30.)[2]

The motion to suppress raises the following issues: (1) whether the initial encounter was consensual or a seizure for

---

[2] In its written response to the motion to suppress, the government argued that the search of Johnson's bag was consensual. During the hearing, Detective Handley testified that he began searching Johnson's bag after he both smelled marijuana and Johnson admitted to having marijuana in his bag, but before asking Johnson's consent to do so.  *See supra* Part I.B.   In light of Detective Handley's testimony, the government decided to abandon the consent argument and instead relied on the initial encounter being consensual, evolving into a valid *Terry* Stop, and the establishment of probable cause to search the bag.  This court will therefore not address the government's consent argument.

purposes of the Fourth Amendment; (2) whether the detectives had reasonable suspicion to justify a *Terry* stop; and (3) whether the events gave rise to probable cause for the detectives to search Johnson's bag.

A.    <u>The Credibility of Witnesses</u>

The threshold issue is the credibility of the witnesses. The court is given wide latitude in making its witness credibility determinations. *United States v. Haynes*, 301 F.3d 669, 678 (6th Cir. 2002)(citing *Anderson v. Bessemer City, N.C.*, 480 U.S. 564, 573-75 (1985)). "In assessing credibility, a court considers numerous factors, ultimately relying on the commonsense test of reason and logic." *United States v. Caldwell*, 2015 WL 179583, at *9 (E.D. Tenn. Jan. 14, 2015).

This court finds Detective Handley and Sargent Bowen credible in this case. Although not in the courtroom when Detective Handley testified, Sargent Bowen corroborated Detective Handley's testimony. Specifically, Sargent Bowen's testimony was consistent with Detective Handley's testimony regarding the process of interdiction at MATA bus stations and Johnson's behavior upon their arrival. Furthermore, Detective Handley's testimony was candid and consistent.

This court finds Johnson's testimony less credible. Although candid about possessing the marijuana and gun, Johnson's testimony was less than clear and contradictory on several occasions.

Specifically, Johnson's testimony as to the officers' arrival, his initial interaction with the detectives, and what, if anything, he said to the detectives, was unclear and/or contradictory at times.

B.   Whether Johnson was Seized for Purposes of the Fourth Amendment

The Sixth Circuit has identified three types of police-citizen encounters that are permissible under the Constitution: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which if consensual, must be supported by a reasonable articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000)(internal quotation marks omitted). Johnson contends that the detectives commenced an investigative detention, requiring reasonable suspicion, when they approached him outside of the convenience store. (Mot. to Suppress 6, ECF No. 24.) Johnson further argues that there was no reasonable suspicion for this investigative detention and that instead the detectives were acting upon a mere hunch. (*Id.* at 3-6.) The government, on the other hand, argues that the officers initially approached Johnson as part of a consensual encounter to ask him why he stepped out of line, therefore, not triggering the Fourth Amendment. (Resp. 3, ECF No. 30.) Accordingly, the first issue is whether Johnson was seized, and if so, at what point in time.

Officers may engage in consensual encounters without reasonable suspicion or probable cause because a consensual encounter does not trigger the Fourth Amendment. *See United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007)(citing *United States v. Alston*, 375 F.3d 408, 411 (6th Cir. 2004)). "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen . . . . Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure." *Florida v. Royer*, 460 U.S. 491, 497 (1983)(citations omitted).

The concept of a seizure defines the line between a consensual encounter and an investigative detention. "A consensual encounter can ripen into a seizure if in light of all the circumstances, [] a reasonable person [would] have believed that he or she was not free to [leave]." *United States v. Foster*, 376 F.3d 577, 584 (6th Cir. 2004). In *United States v. Mendenhall*, the Supreme Court gave examples of circumstances which "*might* indicate a seizure." 446 U.S. 544, 554 (1980)(emphasis added). Those examples include: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.*

15

When Detectives Handley and Knight, along with Sargent Bowen, witnessed Johnson leave the second position in line to walk to the convenience store as the bus was loading, they were free to engage in a consensual encounter by approaching him and asking him questions without violating the Fourth Amendment. None of the factors that weigh against this being a consensual encounter are present. There were only two officers who approached Johnson – Detective Handley and Detective Knight. Sargent Bowen never approached Johnson. Detective Handley and Sargent Bowen consistently testified that all three officers arrived in a marked vehicle and were wearing vests with "police" written on the front and back, as well as wearing their gun holsters and badges. The fact that Detectives Handley and Knight were readily identifiable as police officers does not, alone, suffice to make this initial encounter a seizure. If the court found Johnson's testimony about the officers being in plain clothes credible, it would weigh against Johnson having been seized.

Additionally, although the officers were wearing their gun belts, there was no testimony and Johnson does not contend that the officers brandished those weapons. Nor does Johnson make any allegations that Detectives Handley or Knight made any type of threats or engaged in any threatening behavior. Detective Handley also repeatedly testified that he never told Johnson to stop and he never physically touched him to get his attention. Although

Detective Handley could not remember the exact phrase used, it was clear from his testimony he made no demands or threats when speaking to Johnson.  Lastly, while Johnson testified that he was "scared" and was unsure of what was going on, Johnson never testified that felt as though he could not leave.  Considering the totality of the circumstances, a reasonable person would have felt free to ignore the officers and continue walking away.

Detective Knight's and Detective Handley's initial encounter with Johnson thus failed to rise to the level of a seizure for purposes of the Fourth Amendment.  Because the initial encounter was consensual, no reasonable suspicion was required for Detectives Handley and Knight to approach and question Johnson.  *See United States v. Foster*, 376 F.3d 577, 584 (6th Cir. 2004)(finding that officers asking the defendant for his name, identification, and what he was doing, was permitted as a consensual encounter and did not violate the Fourth Amendment).

Once a consensual encounter becomes a seizure, "the police officer must have a reasonable suspicion of criminal activity to justify a *Terry* stop, or probable cause to justify an arrest.  *Campbell*, 486 F.3d at 954.  Upon smelling marijuana, Detective Handley testified that he asked Johnson whether he had anything illegal.  According to Detective Handley, and the two exhibits submitted into evidence, Johnson stated that he had some marijuana in his bag and Detective Knight then detained Johnson.  Considering

17

the same factors as above, a reasonable person would no longer feel free to leave. Accordingly, the consensual encounter evolved into a seizure, triggering Fourth Amendment protections and requiring reasonable suspicion or probable cause.

C.    Whether There Was Reasonable Suspicion for a Valid *Terry* Stop

Generally, under the Fourth Amendment, a police seizure of a person must be supported by probable cause. *United States v. Fountain*, 2 F.3d 656, 661 (6th Cir. 1993), *overruled on other grounds by Trepel v. Roadway Exp., Inc.*, 194 F.3d 708, 717 (6th Cir. 1999)). In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court set forth an exception to the probable cause requirement for limited investigatory seizures and held that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the person with whom he is dealing may be armed and presently dangerous . . . he is entitled . . . to conduct a carefully limited search." *Id.* at 20-31. "[A] policeman who lacks probable cause but whose 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.'" *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)(footnote omitted)(quoting *United States v. Brignoni-Ponce*, 422 U.S. 873,

881 (1975)).  To establish that a seizure which was not supported

by probable cause was "reasonable," the law enforcement officer

must have a reasonable, articulable suspicion that crime is afoot.

*Terry*, 392 U.S. at 21-22.  Reasonable suspicion cannot be based on

an officer's "'inchoate and unparticularized suspicion or 'hunch,'

but [on] the specific reasonable inferences [] which he is entitled

to draw from the facts in light of his experience.'" *United States

v. Urrieta*, 520 F.3d 569, 573 (6th Cir. 2008)(quoting *Terry*, 392

U.S. at 27).  The inquiry in such cases is two-part:  whether the

initial stop and the subsequent frisk were reasonable under the

Fourth Amendment.

    1.    *Whether the Stop Was Reasonable*

The fundamental inquiry under *Terry* is whether officers "have

a particularized and objective basis for suspecting the particular

person stopped of criminal activity.  *United States v. Cortez*, 449

U.S. 411, 417-18 (1981).  This requirement of a particularized

suspicion has two prongs.  *Id.* at 418.  The assessment of whether

the officer had a particularized suspicion must be based on the

totality of the circumstances known to the officer at the time of

the stop, *id.*, and that assessment must "arouse a reasonable

suspicion that the particularized person being stopped has

committed or is about to commit a crime," *United States v. Montero-

Camargo*, 208 F.3d 1122, 1129-30 (quoting *Cortez*, 449 U.S. at 418,

and *Terry*, 392 U.S. at 21 n.18).

Johnson argues that there was no reasonable suspicion justifying a *Terry* stop. Specifically, Johnson argues that his decision to walk away from the bus stop and away from the presence of police cannot be considered in the *Terry* stop analysis. (Mot. to Suppress 5, ECF No. 24.) In opposition, the government cites to *District of Columbia v. Wesby*, 138 S. Ct. 577 (2018). In *Wesby*, partygoers "scattered" upon noticing police. *Id.* at 587. The Court explained that "[u]provoked flight upon noticing the police is certainly suggestive of wrongdoing and can be treated as 'suspicious behavior' that factors into the totality of the circumstances." *Id.* (citing *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000)). The Court went on to quote its opinion in *Sibron v. New York*, 392 U.S. 40, 66 (1968), and stated "deliberately furtive actions and flight at the approach of . . . law officers are *strong* indicia of mens rea." *Id.* Although factually different from *Wesby* in that Johnson did not run or "scatter" away from officers, the Court's opinion provides for consideration of "deliberately furtive actions" under a totality of the circumstances analysis. As such, the court finds that Johnson leaving the bus station upon the arrival of the officers may be properly considered.

The government also cites to *United States v. Foster*, 376 F.3d 577 (6th Cir. 2004) to support its argument that there was reasonable suspicion to conduct a *Terry* stop. In *Foster*, the Sixth

Circuit upheld the district court's determination that reasonable suspicion justified a *Terry* stop.  Much like in this case, the encounter began as consensual, but upon detaining the defendant, the issue became whether there was reasonable suspicion to justify a *Terry* Stop.  The district court in *Foster* found that the officer had reasonable suspicion justifying a *Terry* Stop where the defendant smelled strongly of PCP, the defendant appeared nervous, the area was notorious for heavy drug trafficking, and where the officer knew that drug traffickers would often hide PCP in or near the dumpsters.  *Id.* at 585.  The Sixth Circuit concluded that the district court did not err in determining the *Terry* stop was based on reasonable suspicion.  *Id.* at 586; *see, e.g.*, *United States v. Parker*, 2012 WL 27304, at *4 (S.D. Ohio Jan. 5, 2012)(quoting *United States v. Kroger*, 152 F. App'x 429, 431 (6th Cir. 2005))("[T]he strong smell of marijuana emanating from the vehicle provided both reasonable suspicion for further investigation and probable cause to search the car.")

Detective Handley's and Detective Knight's stop of Johnson was reasonable under the totality of the circumstances.  Both Detective Handley and Sargent Bowen testified that the officers doing interdiction are dressed in police vests, clearly marked with "police," gun belts, and badges.  Detective Handley testified that they were only thirty feet away from Johnson when Johnson began walking away.  Johnson made the decision to leave the second

spot in line, where he had been waiting for over an hour, while the bus was loading. Detective Handley testified that based on his experience, individuals generally leave the line if they are either carrying contraband or evading a warrant.

Additionally, Detective Handley smelled marijuana on Johnson. According to Johnson, Johnson's bag contained OG Kush and clothes in which he had smoked marijuana seven hours prior. Furthermore, Detective Handley testified, and both the Record of Arrest and the Affidavit of Complaint state, Johnson admitted to having marijuana in his bag. Although Johnson's testimony was unclear as to whether he admitted having marijuana in his bag, it is clear from the record that Detective Handley either smelled marijuana on Johnson, Johnson admitted to having marijuana, or both. Johnson's statement that one of the detectives opened the bag and stated "F*** the weed" upon seeing the Taurus 9mm handgun, bolsters this fact by implying that either by Johnson's confession or Detective Handley's smelling of marijuana, the officers had reasonable suspicion that Johnson was carrying marijuana. Accordingly, considering the totality of the circumstances, it is submitted that the stop was a lawful *Terry* stop.

2. *Whether the Search of the Bag Was Reasonable*

Once an officer has the requisite reasonable suspicion based upon the totality of the circumstances to conduct a stop, the officer may conduct a search to determine whether the individual

is carrying a weapon, if the officer has a justifiable belief that the individual stopped is armed and presently dangerous to the officer or to others. *Terry*, 392 U.S. at 24. Johnson argues that, even if the officers had reasonable suspicion to stop him, the Taurus 9mm handgun should be suppressed as a result of an unlawful frisk. (Mot. to Suppress 6, ECF No. 24.) Johnson cites to *Ybarra v. Illinois*, 444 U.S. 85 (1979), for the proposition that where the officers had no prior knowledge of the defendant and lacked any particular reason to believe he would assault them, a frisk is unlawful. In response, the government argues that where an officer, from his experience, knows that drugs and firearms are often found together, "he ha[s] reason to believe the defendant was [] armed and dangerous." (Resp. 5, ECF No. 30.)

Detective Handley testified that upon approaching Johnson, he smelled raw marijuana. Furthermore, in Detective Handley's experience with over 100 interdictions at MATA bus locations, individuals traveling with marijuana or other drugs are also frequently traveling with weapons for protection of themselves and/or the drugs they are carrying. Accordingly, Detective Handley testified he had concern for officer safety upon smelling raw marijuana. When asked whether he had anything illegal, Johnson replied that he had marijuana in his bag. Considering the totality of the circumstances, including Detective Handley's experience, it

23

is submitted that Detectives Handley and Knight had reasonable suspicion to believe Johnson was armed and dangerous.

"The Supreme Court has [] held that the protective search may extend to the area surrounding the individual during a *Terry* stop 'if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officers in believing the suspect is dangerous and the suspect may gain immediate control of weapons.'" *United States v. Davis-Devine*, 721 F. Supp. 2d 571, 577 (E.D. Mich. 2010)(quoting *Michigan v. Long*, 463 U.S. 1032, 20149-50 (1983)); *see also United States v. Walker*, 615 F.3d 728(6th Cir. 2010)(quoting *Michigan* and applying the rule to uphold officers unzipping a bag to determine whether a gun lay on top of the bag). Based on their reasonable suspicion that Johnson was armed and presented a danger to officers, Detectives Handley and Knight were justified in unzipping the backpack Johnson was carrying with him to check for weapons which he could gain control of. According to Johnson's own testimony, the Taurus 9mm handgun was sitting directly on top of his clothes in the backpack. Accordingly, it is submitted that the officers opening of Johnson's backpack, the search for weapons, and the ultimate seizure of the gun was proper under the Fourth Amendment and the evidence should not be suppressed.

D.    Whether There Was Probable Cause to Support Search of Johnson's Backpack

Additionally, it is recommended that the officers had probable cause to search Johnson's bag based on the smell of raw marijuana.  When a search or a seizure are undertaken without a warrant, the government has the burden of proving probable cause or that an exception exists, such as consent or the conditions of a *Terry* stop have been met.  *See Terry*, 392 U.S. 1; *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990)(citing *Florida v. Royer*, 460 U.S. 491, 500 (1983) to place the burden of proof on the government).  Detection of the smell of marijuana generally provides officers with probable cause to search without a warrant.  *See e.g., Foster*, 376 F.3d at 588 (explaining that the smell of marijuana provided probable cause for a warrantless search of defendant's car); *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993)(holding smell of marijuana constituted probable cause to believe marijuana was in the vehicle, making a warrant unnecessary); *United States v. Rounsaville*, 2018 WL 4909903, at *6-7 (E.D. Tenn. Oct. 10, 2018)(citing several Sixth Circuit cases supporting probable cause determination based on smell of marijuana for search of vehicles and applying the same rule to search of homes).

When Detective Handley approached Johnson and smelled marijuana, Detective Handley had probable cause to search Johnson

and the backpack he was carrying for evidence of marijuana. Because Detective Handley had probable cause on the basis of the smell of marijuana, the warrantless search of the backpack did not violate the Fourth Amendment. Accordingly, it is recommended that the items found in the backpack not be suppressed.

### III. RECOMMENDATION

For the foregoing reasons, it is recommended that Johnson's motion to suppress be denied.

Respectfully submitted this 10th day of March 2020.

s/Diane K. Vescovo
DIANE K. VESCOVO
CHIEF UNITED STATES MAGISTRATE JUDGE

### NOTICE

Any objections or exceptions to this report must be filed within fourteen (14) days after being served with a copy of the report. 28 U.S.C. § 636(b)(1)(C). Failure to file them within fourteen (14) days may constitute a waiver of objections, exceptions, and any further appeal. Any party objecting to this report must make arrangements for a transcript of the hearing to be prepared.

26